Filed 5/11/15  P. v. Turner CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B254811 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA175940) |
| v. | |
| MIKONA TURNER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Affirmed.

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

After attempting to kill her infant daughter in 1998, appellant Mikona Turner was found not guilty by reason of insanity. Since 2001, except for a brief time more than eight years ago when she requested hospitalization, Turner has resided in a supervised outpatient board and care facility under a forensic conditional release program (CONREP). Medications have controlled her symptoms. Turner has not endangered or threatened anyone since her commitment.

Pursuant to Penal Code section 1026.2,[1] Turner applied for release on the ground that her sanity has been restored. In the trial on her application, two psychiatrists recommended that Turner be found restored to sanity, citing, among other things, her improved insight into her mental condition and her well developed safety plan. Turner testified that she is committed to her medication regimen and has developed a support network she would rely upon if her symptoms returned. Turner's CONREP therapist, however, recommended against restoration.

The court denied Turner's application. Although it noted that Turner had made progress, the court agreed with the CONREP therapist's view that Turner needed to demonstrate better financial management to pay for her medication, exercise better decision making regarding personal relationships, and show progress toward a less supervised setting within CONREP. Turner, the court concluded, had not met her burden of showing that restoration to sanity was appropriate. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1998, during a psychotic episode in which Turner experienced delusional voices threatening torture, Turner cut the wrists of her two-month-old child with a razor blade.[2] In 1999 she was found not guilty by reason of insanity and sentenced to a maximum term of ten years in the state mental hospital.

---

[1]     Statutory references are to this code.

[2]     The child survived and was adopted; Turner's parental rights were terminated and she has had no contact with the child.

2

Turner was committed to the state hospital in 1999. In 2001 Turner was released to an outpatient setting supervised by CONREP and, except for 10 months in 2006, has lived under CONREP's auspices in a board and care facility. There Turner has received individual and group therapy and medication, and she is subject to strict supervision. In February 2006, because she recognized the return of symptoms of mental illness, Turner voluntarily requested return to a hospital setting. That placement lasted until December 2006 when she returned to outpatient residency at the Gateways Forensic Community Treatment Program.

Since her commitment, Turner has not threatened or endangered anyone. She has attended therapy and group meetings, complied with her medication regimen, volunteered at her church, and displayed insight into her mental illness. She has on occasion displayed questionable judgment regarding relationships and, in 2013, missed making medication co-payments for several months.

In 2013 Turner petitioned for restoration of sanity under section 1026.2. The court conducted a trial over the course of several days in January and February 2014. Turner offered the testimony of two psychiatrists, her pastor, and her own testimony. The People offered the testimony of Turner's CONREP psychologist. The court also reviewed the court file and the reports submitted by the witnesses.

1. *Turner's evidence in support of her application for restoration of sanity*

Two psychiatrists who testified on Turner's behalf recommended that she be restored to sanity because she was not a danger to the community. Dr. Gordon Plotkin testified that based on his two hour interview and review of records, he found Turner very insightful about her mental illness, explaining that "in the forensic community treatment program at CONREP, insight really is significant." He characterized Turner as "within the top 10 percent of the people that I have evaluated at that particular program." Dr. Plotkin testified that Turner did not pose a danger to the health and safety of others as a result of mental disease and that her current medication regimen controls her mental

3

condition. Dr. Plotkin stated that without treatment, Turner "would decompensate," that is, her defenses to pathology would deteriorate. He stated that "in an out-patient program with an out-patient psychiatrist, hopefully, therapist and some social worker access like what's available in the community, she'd be just fine."

Dr. Plotkin's opinion was that Turner will continue to take her medicine in an unsupervised environment. Asked about Turner's prospects if she is restored to sanity and released, he testified, "based on her level of insight, I believe she's going to stay compliant with her medication." He explained that Turner understands why she needs the medications and what they do: "She plans on staying on them and she's also able to say to me what would happen if she went off of them and had excellent insight about that. And that's usually the missing factor." On the ultimate question of the "risk of her stopping her medication," Dr. Plotkin stated, "fortunately, I don't have to make that decision." Dr. Plotkin said he was a "little bit" concerned about Turner's ability to manage her finances; he stated that it would be crucial that she do so, it may be difficult for her initially, and she may need guidance with that. With respect to Turner's transition plan to a less supervised setting, Dr. Plotkin considered it "thorough" and "appropriate," noting, "I'd like to have all of my patients have a plan like that." Dr. Plotkin noted that more important than having a detailed written plan, Turner could explain its contents.

The court's questions to Dr. Plotkin focused on Turner's potential transition from the highly structured and supportive environment she had been in for over 12 years. In Dr. Plotkin's judgment, Turner was likely to continue to take her medication in an unsupervised environment, and posed no danger to others while she was taking her prescribed medication. Dr. Plotkin did not know whether the resident facility delivers medication to Turner, or whether she is responsible for taking her own medication. The court also asked whether, if Turner is restored to sanity, CONREP could assist her before she departs. Noting that "it's a little bit of a Catch-22," Dr. Plotkin explained that CONREP does not provide any assistance until the patient is actually restored. Later, he elaborated on the court's concern about the transition to restored status:

4

[Dr. Plotkin]: And unfortunately, CONREP's position is until a judge restores the person's sanity, that they're not going to have any part of that and so they really actually say to the person, you have to find out yourself, we're not going to help you.

The Court: One day a judge says you're restored to sanity and all of a sudden they help or how does that work, do you know?

[Dr. Plotkin]: I sure hope they're going to help because as I said, it's a daunting task.

Dr. Plotkin described CONREP as having "draconian" rules, but also having good intentions and being committed to improving the lot of the patients in their care. In Dr. Plotkin's view, CONREP appeared to lack the ability to "let themselves say, this person's restored, because I think, frankly, they let the bench decide that."

Dr. Sanjay Sahgal, another psychiatrist, also testified on behalf of Turner. His opinions were based on a review of the records and a one hour interview with her. Asked about Turner's likelihood of continuing to take her medications, Dr. Sahgal stated that while he could not predict the future, the data suggest "that she falls into the very-high-likelihood category of staying on her medications and consulting with doctors as recommended to make sure that her medications are working." Dr. Sahgal observed no signs of delusional thought in Turner:

> She was calm, alert, well-groomed and neatly attired in casual clothing. Her speech was clear and fluid. She was forthright, communicative. Somewhat distraught, perhaps understandably so given her situation, but not significantly depressed, anxious, irritable or manic. She demonstrated no signs of psychosis such as delusional thinking or response to hallucinations and her cognitive performance throughout the entire was intact. Based upon screening questions for memory, language, concentration and attention, she appeared to be above-average intelligence.

5

Dr. Sahgal testified that Turner demonstrated insight into her illness and the events that led to her institutionalization. She spoke about the charged offense with "courage and forthrightness that was remarkable in the sense that she talked about what happened and her symptoms at the time. She spontaneously demonstrated an understanding of the link between her not being on medication at the time of the controlling offense and her manifestation of psychosis. . . . She acknowledged that the medications have been useful, that they are currently essential." Dr. Sahgal stated that Turner displayed insight during the interview, and presented a "written plan for relapse prevention that was one of the more thorough plans I've seen in my practice." He also found significant that Turner "was able to articulate the plan without having to have the written material in front of her," which indicated that "this is information that she carries around with her and understands." Moreover, Turner had a "backup plan," which Dr. Sahgal stated was "remarkable."

Dr. Sahgal commented on the "difficult alliance" between the patient and CONREP where, "by necessity, there is a limit to . . . confidentiality. The psychotherapy session is by its very structure, part treatment and part assessment to be reported to all." He stated that in contrast to a typical psychotherapeutic relationship, in which confidentiality is intended to promote candor and trust, "if you know that the therapy notes and the things that go on in therapy are going to be reported to a court of law, which in turn will be deciding your civil commitment status, it would lead to more distrust [and] misunderstanding . . . ." This "dual-role-therapy" is stressful, Dr. Sahgal testified, and indeed, continued commitment for a person in remission because of their medication could be antithetical to treatment. In Dr. Sahgal's 15 to 17 years consulting on over 500 restoration cases, he knew of not a single time CONREP ever recommended that a person be restored.

Summarizing his conclusions, Dr. Sahgal opined that Turner posed a low risk of harm to others: "She represents an elevated risk of dangerousness to the community due to her mental disorder compared to the general population that will never change. . . . However, compared to the population of individuals in her situation, . . . she has

6

addressed all changeable or elastic risk factors such that she is a very low risk of physical harm to others compared to the population of folks who are found insane by the court." On the important question of whether, in an unsupervised environment, appellant would continue to take her medication, Dr. Sahgal stated that he believed she would, based on her understanding of why she is taking it, the plan she has made, and the "treatment allies" where she will live. He stated that for the clinical treatment of schizophrenia, "that's about as good as it gets."

In cross-examination, Dr. Sahgal noted that before she committed the offense in 1998, Turner had gone off her medications. Turner's current relapse prevention plan is similar to one she had offered in 2009, when the court had previously declined her request to be restored.

The court inquired about Turner's housing arrangements if she were to be restored. Dr. Sahgal stated that Turner wanted to stay at the board and care facility she is at now; her backup was to work with an organization called SHARE, which would find her housing and a roommate and organize transportation to clinics and services. The court received a letter from SHARE, identified as the Self-Help and Recovery Exchange, indicating that Turner had been participating in the program since 2013, and that she would have the opportunity to move into its program if she were restored. The court inquired further of Dr. Sahgal's opinion about Turner's risk of danger to others. His "very low risk" opinion was based on Turner's continuing medication compliance, insight into her illness, history of no episodes of violence, the existence of a social support system, and the absence of current symptoms.

Turner also testified. She identified her psychiatric diagnosis and stated that it meant, "I have a mental illness and . . . I have to take medication and go to groups and have a doctor and a therapist for the rest of my life." She described the harrowing delusions that afflicted her the night she tried to kill her child and herself, and identified triggers of stress that exacerbated her mental illness symptoms. Turner testified that she "loves" not having symptoms any longer, understands that the medications control it, and will "go through hell and high water" to pay for the medication. Asked about making

7

sure to pay for her medications, Turner explained that after speaking with her therapist, for the previous five months she had been paying her co-payment. Apparently the price had increased from $5 per month to $20 per month, so Turner cancelled her telephone so that she would have funds for the medicine. Turner testified that she receives Supplemental Security Income based on her disability of $1,124 monthly. Of that, $1,103 is paid to the board and care facility and $20 per month is for the medication co-payment. Turner described her safety plan, her social network, and the volunteer work she does at a church.

Turner admitted that she had failed to pay the co-payments for her medication for some six months in 2013, characterizing her lapse as "lazy," but had since come to recognize that paying for medications was a higher priority than paying for her phone. She stated that if she were restored, she intended to remain in her current board and care facility for 6 to 12 months, and then participate in the SHARE program. She explained where she would purchase her medications and whom she would call if she had problems. Turner described her fear of again experiencing the psychotic symptoms as a reason that "I will always take my medication." Since 1998 she has never gone off her medications.

A further witness for appellant was the pastor of the church where Turner attends weekly services and performs volunteer work. Rev. Jacoba Vermaak testified that she had known Turner for two years, saw Turner regularly twice a week, asserted she would recognize abnormal behavior by appellant, and would help Turner if she stopped taking her medications or otherwise exhibited symptoms of mental illness. Vermaak had no formal mental health training and was unfamiliar with the specific medications Turner was taking.

   2. *The People's evidence in opposition to restoration*

Opposing the application, the People offered the testimony of Turner's primary clinician Lindsay Salseda, a psychologist with Gateways Forensic Community Treatment

Program.  Dr. Salseda testified that she saw Turner three times a month, and, beginning in September 2012, had had about 60 sessions with her.  Dr. Salseda had never seen Turner behave dangerously or threaten anyone; she also testified that Turner had always taken her medications.  But Dr. Salseda recommended against granting Turner's application for restoration of sanity.  She felt that Turner had not exercised good judgment about certain people, including members of her family, and that some of those personal relationships were potential triggers for further symptoms.  Dr. Salseda also pointed to Turner's lapses in financial management, which, she stated, might cause Turner to miss co-payments for medications and thereby interrupt the medication program that has controlled her symptoms.

Dr. Salseda related Turner's history at the facility.  Turner came to the CONREP program at Gateways in 2001 from the state mental hospital.  In 2006 Turner recognized the return of symptoms and asked to be returned to the hospital.  She returned to CONREP in late 2006.  At CONREP Turner is at the intermediate level of care.  In order of decreasing restrictiveness, the levels of care are intensive, intermediate, supportive and transitional.  Dr. Salseda explained that the intermediate level of care was for patients who require intervention and support.  Turner, she said, saw Dr. Salseda three times per month, had group therapy four times per month, visited with the staff psychiatrist once a month, and participated in a social improvement program four to five times during the week.

Turner, according to Dr. Salseda, had not demonstrated financial responsibility or made good relationship choices.  Dr. Salseda testified that in 2013 Turner missed about six months of co-payments, although she acknowledged that while with CONREP, Turner receives the medications whether she pays or not.  Dr. Salseda maintained that Turner "is not suitable for restoration at this time" because:
"I don't believe she's demonstrated the ability to effectively manage her mental illness without our treatment and supervision so that she doesn't pose a risk of dangerousness to the community," and that her "primary concern" was Turner's "lack of financial responsibility with regards to her medication."  Dr. Salseda also pointed to a 2010

9

occasion when Turner purchased over-the-counter medicine for a nephew. Dr. Salseda stated that "it just demonstrates that she may put someone else's needs before her." Another concern voiced by Dr. Salseda was what she called Turner's "tendency to put herself in a positive light and at times omit things in treatment that are relevant or important to her treatment."

Dr. Salseda identified areas of progress she would like to see before Turner is restored to sanity: "Just to be more financially responsible and . . . prioritize her medication payments. . . . [D]emonstrate better decision-making, whether it comes to relationships, boundaries. And then also, just move to a lower level of care within the program." Dr. Salseda disagreed with the assessments of Drs. Plotkin and Sahgal based on the greater experience she had had with Turner.

The court inquired about what would qualify Turner for a change in the level of care at CONREP. Dr. Salseda replied "financial responsibility, paying mostly around her medication, making good choices with regards to men, relationships, being forthcoming." Dr. Salseda had not considered changing Turner's level of care. The court asked what factors would be significant in being able to recommend restoration. Dr. Salseda answered: making medication payments a priority, consistently paying for them, demonstrating that she could budget and pay for them on a consistent basis, make good relationship choices, and "transition to a supportive level where her life parallels more of what it would look like if she was discharged." Dr. Salseda also wanted Turner to be "more forthcoming about, you know, she does make a bad decision, come in saying, you know, 'I did this . . . .' As opposed to when there's been times in the past where it's, you know, 'Let's try to avoid it, to cover it up,' not bring it forward." Dr. Salseda conceded that "it is difficult being that we do report to the courts and the clients know that. But on the same token, we do want them to be forthcoming and honest especially with symptoms, stressors, things that could be difficult for them." Dr. Salseda has never recommended that a CONREP patient be restored to sanity.

Dr. Salseda acknowledged that even when Turner was experiencing stress with her family she did not become dangerous with other people and did not threaten anyone.

10

During Turner's entire time with CONREP she had always taken her prescribed medications. Turner never told Dr. Salseda she wanted to stop taking medication; to the contrary, "she's expressed her intent to continue taking it." Dr. Salseda also recognized that although Turner had experienced some periods of increased anxiety, she had not experienced delusions, paranoia or any of the other psychiatric symptoms that led to her commitment. The therapist stated that her reasons for recommending against restoration – money management, personal relationships, engagement in treatment – did not induce Turner to stop taking her medications or cause her to experience hallucinations. Dr. Salseda further testified that apart from the incident in 1998, and despite occasions in which Turner reported anxiety and stress, she knew of no instance in which Turner had ever threatened anyone. In the weekly group sessions, Turner "participates well, interacts appropriately with her peers in that group and . . . attends on a pretty consistent basis . . . ." Moreover, Dr. Salseda explained, Turner has learned skills while at CONREP, including improving her boundaries, insight into her mental illness, and ways to manage stressors. Turner's symptoms are in remission.

The trial court also reviewed the court file, reports of witnesses, and the safety plan prepared by Turner. Several reports were submitted by the People, all written by Dr. Salseda, and they substantially echo her testimony. A May 2013 report indicates that Turner "has been psychiatrically stable throughout the reporting period," has "shown insight into her mental illness, is open to analyzing enmeshed family dynamics, and has been able to manage several stressors at the same time without becoming overwhelmed." But Dr. Salseda expressed concern that Turner "continues to overestimate her ability to set limits and keep them." The report did not address whether Turner will continue taking her medicine in an unsupervised environment.[3] A July 2013 Restoration of Sanity

---

[3]    It is peculiar that this report asserts that Turner "is capable of holding a job." That opinion, offered without substantiation, is contrary to the finding of the Social Security Administration that Turner, a recipient of Supplemental Security Income, is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." (42 U.S.C., § 1382c, subd. (a)(3)(A).)

Report ("Report") details violations of CONREP rules, especially those concerning relationships, but offers no evidence that any of these episodes triggered a psychiatric problem, interrupted Turner's medication routine, or led to violent or threatening behavior. The Report states that "[o]ne of Ms. Turner's strengths continues to be her level of insight into her mental illness. She is able to identify and report symptoms, warning signs, and triggers to her mental illness." Yet, the Report says, Turner "lacks insight into what could be destabilizing for her and fails to make the connection between an increase in her level of stress and rapidly becoming symptomatic." The Report frequently brings up the stress caused to Turner by her family, but at the time of trial the evidence was that many of those family members had moved out of state.

In the Report, Dr. Salseda notes the disconnect between Turner's expressed intent and her actions, particularly concerning finances. Acknowledging that Turner has "remained medication compliant due to the structure of the program and has expressed the intent to stay on her medication," the Report states, "her actions speak otherwise," noting an "ongoing difficulty paying for her medication while in CONREP."

The Report also discusses the use of a checklist called HCR-20, which appears to aid in making assessments by tallying various risk factors. According to the Report, it "is not an actuarial measure that provides a numerical baseline estimation of violence risk," but is claimed to be useful in identifying "the presence of a constellation of factors" associated with risk for violence recidivism. The methodology for use of this tool was not specified, and the factors considered seem remote in time and imprecisely defined. The HCR-20 was not discussed by Dr. Salseda in trial or offered as the basis for any argument by the People. Without a more robust foundation it is of doubtful admissibility, much less substantial evidence. Because this checklist does not appear to have contributed to the court's order, we do not consider it further.

On behalf of Turner, Dr. Plotkin's report took issue with CONREP's view that Turner lacked insight about potential triggers. Turner "has quite a bit of insight regarding her past history of co-dependency, difficulty with boundaries, financial stress, family interactions, inappropriate relationships, and the psychiatric illness that precipitated her

12

commitment offense. It is also important to note that for the most part during the two exacerbations of her illness, she has been the primary individual to seek treatment . . . ."

### 3. *The court's denial of the application for restoration of sanity*

The superior court denied Turner's application. In making its ruling the court noted that it had reviewed all the reports and testimony. Turner's application, the court said, was governed by the standard set forth in CALCRIM jury instruction No. 3452. The court summarized the testimony of the expert witnesses, observing that "all doctors agree that in a supervised environment . . . Ms. Turner is not a danger to the health and safety of others. According to Dr. Salseda, defendant is not yet suitable for restoration to sanity because she does not manage her mental illness and is therefore a danger to the community." The court also summarized Dr. Salseda's testimony that Turner had to, "one, take and show financial responsibility for payment toward her medication, two, show better decision-making and, three, progress to a lower level of care at Gateways CONREP." Noting that defendant had the burden of proof, the court stated that while it "believes defendant is making significant progress toward restoration, there are areas of concerns noted by Dr. Salseda. At this point in time, the court does not believe that the defense has carried the burden of proof; and therefore, denies the petition . . . ."

Turner appeals the denial of her application for restoration of sanity.

### DISCUSSION

### 1. *Legal standard regarding restoration of sanity*

Section 1026.2 provides that a person who has been committed to a state hospital after being found not guilty by reason of insanity (see § 1026), may apply to the superior court for release on the ground that his or her sanity has been restored. Section 1026.2, subdivision (e) establishes a two-step procedure for such an application. The first step is

13

to "hold a hearing to determine whether the person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community." (*Ibid.*) If the court concludes the person is not a danger to others, he or she is placed in an outpatient treatment program for one year. This first step is not involved in Turner's application, because she has been in an outpatient program under supervision of CONREP for over thirteen years. (§ 1026.2, subd. (f).)

In the second step of section 1026.2, subdivision (e), after the defendant has spent at least one year in the outpatient treatment program, the court "shall have a trial to determine whether sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder." The defendant-applicant bears the burden of proof by a preponderance of evidence and is entitled to have the matter determined by a jury. (§ 1026.2, subd. (k); *In re Franklin* (1972) 7 Cal.3d 126, 148 (*Franklin*) [interpreting then section 1026a, predecessor to section 1026.2].)

In order to be restored to sanity, the applicant need not show that she is no longer legally insane; she need show only that she is not likely to cause injury or pain or expose herself or others to injury. (*Franklin, supra,* 7 Cal.3d at p. 145; *People v. Williams* (1988) 198 Cal.App.3d 1476, 1480 (*Williams*).) In *Williams* the Fourth District approved a jury instruction stating sanity is restored under section 1026.2 when the applicant is no longer dangerous in a medicated condition and will continue to self-medicate in an unsupervised setting. (*Id.* at p. 1479.)[4] In ruling on Turner's application, the trial court

---

[4] The jury instruction in *Williams* stated in part, "in order to have the Defendant's sanity legally restored, while in a medicated state, you must also find, by a preponderance of the evidence, that the Defendant will continue to take his medication as prescribed, in an unsupervised environment." (*Williams*, *supra*, 198 Cal.App.3d at p. 1479.)

CALCRIM No. 3452 was adopted in light of *Williams* and provides in pertinent part: "[The law presumes that the defendant currently poses a danger to the health and safety of others as a result of a mental disease, defect, or disorder. In order to overcome

14

expressly referred to CALCRIM No. 3452, the jury instruction engendered by the *Williams* decision.

   2. *Standard of review*

   The standard of review of a determination under the first step of section 1026.2, subdivision (e) – whether a defendant-applicant will be a danger to others while under supervision and treatment – is abuse of discretion. (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900.) Turner's application, however, invokes the second step, which is a determination that may be made by a jury in which the defendant-applicant has the burden under a civil law preponderance of the evidence standard. (§ 1026.2, subd. (k); *Franklin, supra,* 7 Cal.3d at p. 148; *People v. Mapp* (1983) 150 Cal.App.3d 346, 351 (recognizing "inherently civil nature of a section 1026.2 proceeding").)

   Turner argues, without expressly identifying the standard of appellate review in her briefs, that the evidence at trial was insufficient to justify denying her application. The People discuss the burden of proof at trial but not the standard of review on appeal. As noted, we apply an abuse of discretion standard to review the trial court's determination under the first step of section 1026.2. (See e.g., *People v. McDonough* (2011) 196 Cal.App.4th 1472, 1489-1494 (*McDonough*) ["In determining whether the trial court abused its discretion, we look to whether the court relied on proper factors and whether those factors are supported by the record."]; *People v. Dobson* (2008) 161 Cal.App.4th 1422, 1434 ["The trial court's ruling at this stage [the first-step determination under section 1026.2] is reviewed for an abuse of discretion."].)

   Our search has revealed no published cases addressing the standard of review applicable to a trial court's determination of the second-step determination. A defendant-

---

this presumption, the defendant has the burden of proving that it is more likely than not that: 1 (He/She) is no longer a danger to the health and safety of others because (he/she) is now taking prescribed medicine that controls (his/her) mental condition; AND 2 (He/She) will continue to take that medicine in an unsupervised environment.]"

applicant's right to a jury trial and section 1026.2, subdivision (k)'s requirement that the defendant-applicant prove she is no longer dangerous by a preponderance of the evidence suggests that a substantial evidence standard applies to a review of the trial court's second-step determination. (See *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1504 ["[T]he substantial evidence standard is . . . used in reviewing any disputed factual question, whether it arises at trial or otherwise . . . ."]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 ["When the trial court has resolved a disputed factual issue, the appellate courts review the ruling according to the substantial evidence rule. If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed."].) We need not determine which standard applies because we would reach the same conclusion under either standard.[5]

> 3. *The issue at trial was whether Turner was likely to continue taking her medication, and thus keep her mental condition in remission, in an unsupervised setting*

Under section 1026.2 Turner bears the burden of showing she is no longer a danger to the health and safety of others due to mental defect, disease, or disorder. During her entire commitment, Turner has not posed such a danger. She has not been violent or made any threats, and has for the most part been free of any symptoms of mental disorder. The record is undisputed that in her present medicated condition, Turner is not a danger to others. Thus, Turner met her burden under the first prong of CALCRIM No. 3452 that she is no longer a danger to the health and safety of others because she is now taking prescribed medicine that controls her mental condition. The

---

[5] Indeed, in cases involving review for abuse of discretion fact-based inquiries, the abuse of discretion standard is sometimes defined in a very similar manner to the substantial evidence standard: "whether the court relied on proper factors and whether those factors are supported by the record." (See *McDonough*, *supra*, 196 Cal.App.4th at p. 1489 [applying the abuse of discretion standard in reviewing the trial court's factual finding under the first prong of section 1026.2].)

court concluded that Turner failed to meet her burden on the second prong: whether Turner established that she will continue to take her prescribed medicine in an unsupervised environment. (See *Williams, supra,* 198 Cal.App.3d at p. 1479 [reversing refusal to give jury instruction that a finding of restoration is warranted if the defendant is not a danger to others while in a medicated condition and will continue to take medication in an unsupervised environment].)

The uncontradicted evidence was that Turner has continued to take her medication during her entire commitment, including her entire period while under the supervision of CONREP. All witnesses, including Dr. Salseda, testified that Turner has never indicated a desire to stop taking the medication. Indeed, Turner has repeatedly expressed her intention to continue to do so, primarily because she is aware of and desires to avoid the symptoms that would recur if she stopped.

In this appeal, we determine whether the court correctly concluded that Turner failed to meet her burden of showing that she would continue to take prescribed medicines in an unsupervised environment. Because the evidence upon which this decision was based involved conflicting expert opinions, we comment on the court's role in evaluating expert testimony.

4. *Expert opinion testimony must have a logical link between objective facts and the offered opinion*

Most of the trial evidence in this case was expert opinion testimony offered by both sides. The court must exclude opinions that are based on assumptions without evidentiary support or on speculative, remote or conjectural factors. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*) ["'[T]he matter relied on must provide a reasonable basis for the particular opinion offered, and . . . an expert opinion based on speculation or conjecture is inadmissible.'"], quoting *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563; see also *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487 ["'[W]here an expert bases his conclusion

17

upon . . . factors which are speculative, remote or conjectural, . . . the expert's opinion cannot rise to the dignity of substantial evidence.'"].)

Neither party objected to the opinion testimony offered, and accordingly the court was not asked to perform a "gatekeeping" role. To a degree, this is understandable, because although defendant was entitled to a jury, this was a bench trial. Nevertheless as our Supreme Court explained in *Sargon,* "under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 770.) In *Sargon* the Supreme Court affirmed a trial court's exclusion of an expert witness's lost profits calculation as speculative. The Court explained that matter relied on by the expert "'must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.'" (*Ibid.*) This process requires the trial court to "determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Id.* at p. 772.) *Sargon*, to be sure, involved a very different case from whether a party will continue to take medicine in an unsupervised environment. But *Sargon* explained that a decision about the likelihood of future events underscores the importance of the trial court's review of evidence: "Because it is inherently difficult to accurately predict the future . . . it is appropriate that trial courts vigilantly exercise their gatekeeping function when deciding whether to admit testimony that purports to prove such claims." (*Id.* at p. 781.)

As mentioned, neither party raised objections below, so our inquiry does not concern whether evidence should have been excluded. But in considering whether the expert opinion evidence relied upon is reasonable, credible and of solid value – whether it is substantial – we are directed by *Sargon* to inquire into whether the material on which an expert relies "actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" (*Sargon*, *supra*, 55 Cal.4th at p. 771, quoting *General Electric Co. v. Joiner* (1997) 522 U.S. 136, 146.)

18

We discuss below whether such analytical gaps exist. Because Turner may apply again for restoration one year after denial (see § 1026.2, subd. (j)), if Turner supported such an application with evidence that she had no recent incidents of dangerous or menacing conduct toward others, no recurrence of symptoms of mental illness, insight into her condition, a plausible safety plan, responsible financial management, and was conscientiously taking prescribed medication, we would expect the People to offer evidence linking Turner's objective conduct with the ultimate issue of whether Turner will have the intention, means, and incentive to continue taking her medicine in an unsupervised environment. Such evidence might include the specific training and education CONREP has provided to Turner to prepare her for independent medical and financial management and the results of a scientifically validated risk assessment.[6]

5. *We defer to the trial court's evaluation of the testimony and find, on this record, that substantial evidence supports the denial of restoration*

Turning now to the substance of the evidence, the three reasons offered by the People in the trial for denying Turner's application were that Turner had not been financially responsible for medication co-payments, had not exercised good judgment in

---

[6]     See, e.g., Monahan et al., Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence (Oxford University Press 2001) p. 64 [contrary to public view, diagnosis of schizophrenia associated with a lower rate of violence than patients diagnosed with depression or bipolar disorder]; Slobogin, Proving the Unprovable: The Role of Law, Science, and Speculation in Adjudicating Culpability and Dangerousness (Oxford University Press 2007) [comparing and discussing limits of clinical and actuarial prediction methodologies and courts' receptivity to them]; Singh et al., *A Comparative Study of Risk Assessment Tools: A Systematic Review and Metaregression Analysis of 68 Studies Involving 25,980 Participants* in Clinical Psychology Review (2011) [identifying standard risk assessment tools with higher and lower predictive validity]; Monahan et al., *An Actuarial Model of Violence Risk Assessment for Persons with Mental Disorders* in Psychiatric Services (July 2005), vol. 56, pp. 810-815 [model combining specific variables relating to psychiatric inpatients predicted high and low risk for violence with considerable accuracy].

19

personal relationships, and had not been "engaged," or sufficiently prompt, in disclosing information to her therapist.

The latter two arguments, as applied to the evidence received here, have no bearing on the likelihood of Turner continuing to take her antipsychotic medications in an unsupervised setting. In the past, Turner has experienced stress from family members who have now moved out of state. She was, in Dr. Salseda's view, unduly generous with a nephew. She gave a man her phone number, although she did not establish relationship with him; there is no evidence she so much as talked to him on the phone. None of this conduct caused any disruption in Turner's taking of medication or constitutes substantial evidence that Turner is likely to fail to take her medicine if restored.

The argument that Turner had been insufficiently engaged with her therapy, as evidenced by past delays in reporting symptoms or events, is even more amorphous and attenuated from the issue at hand. None of these incidents affected Turner's ability to maintain a regular medication schedule. This argument is also troubling because of what all witnesses recognized was the inherent conflict in the CONREP relationship with Turner. Turner is expected to trust her clinician and disclose everything so she can continue to improve, but CONREP may use whatever she discloses and any perceived delay in disclosure to her disadvantage. While Dr. Salseda's testimony on this point may have indicated that Turner is not a perfect patient, none of the conduct attributed to Turner indicates that if she is restored she will endanger the community by forgoing her medicine.

Turner's 2013 record of missing six co-payments for her medicine is, however, relevant to the issue of her continued adherence to her medication regimen. Although Turner's missed payments did not affect her ability to receive her medication while in CONREP, all three doctors agreed that missed co-payments could result in Turner not receiving her medication, depending on what type of residential and treatment settings she would choose if restored and released from CONREP. Neither party disputes, and all witnesses acknowledged, that it is imperative that Turner continues taking her medicine in order that she not be a danger to herself or others in an unsupervised setting.

20

Of course, one should not confuse Turner's poverty with her sanity. After paying her $20 Medi-Cal co-payment and the fee withheld by the board and care facility it appears that Turner has one dollar per month left. Turner herself acknowledged that she had been "lazy" concerning the payments, although there is evidence that she had some unusual financial problems in 2013 and also that the co-payment amount quadrupled to $20 per month. At the time of trial Turner testified that she had made the $20 payments for five months.

Further, this is an issue that can be resolved in the future, and it appears that, since she missed her co-payments in 2013, Turner has taken steps to eliminate, or at least mitigate, the issues that could lead to missed payments once she is released to an unsupervised environment. Most importantly, she recognizes that continuing to take her medication is her primary concern in controlling her mental illness, and she understands that she needs to prioritize her expenses in a manner that will always allow her to pay for her medication going forward. For example, she has canceled her telephone subscription to save additional money to ensure that she can make her co-payments in the future. There was substantial evidence to support the court's observation that Turner had made "significant progress toward restoration."

Nevertheless, the court was entitled to conclude that Turner's lapse in making her co-payments, which was relatively recent and involved more than a single instance of nonpayment, was sufficient to establish that Turner had not met her burden of proving that she would likely meet her medical needs if restored. While the court made no express findings regarding credibility, we defer to the trial court's assessment of the witnesses' testimony and demeanor in evaluating their persuasive power. This is not to say that if, in a future trial, Turner establishes a consistent record of paying for her medication, we would view the matter similarly. But that is a matter for the superior court to consider in the first instance. We cannot say on this record that the court abused its discretion or that there is an absence of substantial evidence supporting the court's order.

## DISPOSITION

The order is affirmed.


IWASAKI, J.[*]


**We concur:**



PERLUSS, P. J.                    ZELON, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.